UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| Jeffrey Neylon,<br><br>        Plaintiff,<br><br>v.<br><br>BNSF Railway Co.,<br><br>        Defendant. | Case No. 4:17-cv-533<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## PRELIMINARY STATEMENT

1. For reasons unique to the railroad industry, carriers have a financial incentive to retaliate against employees who report injuries. See, e.g., Report of Majority Staff of the Committee on Transportation and Infrastructure Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads: Hearings Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (Oct. 22, 2007) ("Hearings"). Because carriers have a long history of acting on this motive, Congress amended the Federal Railroad Safety Act, 49 U.S.C. § 20109 ("FRSA"), to add new prohibitions against railroads, provide employees a private right of action in federal court, and relax the standards of proof for retaliation claims. See The Implementing Recommendations of the 9/11's Comm. Act of 2007, P. L. 110-53, 121 Stat. 444 (Aug. 3, 2007). Courts have recognized that these amendments were intended "to ensure that employees can report their concerns without the fear of possible retaliation or discrimination from employers." Araujo v. New Jersey Transit Rail Operations, Inc., 708 F.3d 152, 157 (3d Cir. 2013) (quoting Hearings) (internal quotation marks omitted).

2. Defendant BNSF Railway Co. in particular has a history of retaliating against employees who report injuries, which has continued after Congress amended the FRSA. (*infra*, ¶¶ 17-19.) This includes against Plaintiff Jeffrey Neylon, who was BNSF's longtime loyal employee up and until he reported a cumulative-trauma injury. Then, BNSF claimed Neylon should have somehow known and reported the extent and cause of his injury prior to when he sought medical treatment for it, and terminated him for not so doing.

## PARTIES

3. BNSF is a railroad carrier engaged in interstate and foreign commerce. It is headquartered in Fort Worth, Texas.

4. Jeffrey Neylon worked for BNSF as a conductor for nearly fifteen years. He resides in Nebraska.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction over Neylon's FRSA claim under 28 U.S.C. § 1331.

6. Venue is proper under 28 U.S.C. § 1391 because BNSF is headquartered and the illegal conduct occurred in the Northern District of Texas.

## NEYLON REPORTS A WORK-RELATED INJURY AND IS TERMINATED

7. In June of 2015, Neylon felt a pop in his left ankle while climbing onto a train.

8. While the pop was accompanied by pain, the latter quickly subsided.

9. Accordingly, Neylon did not believe he was injured.

10. Indeed, Neylon finished his shift without issue.

11. Nearly a year and a half later, Neylon was suffering from pain in his left ankle, which caused him to seek treatment from a physician.

12. The physician diagnosed Neylon with tendinitis and ordered him to take time off of work.

13. Neylon reported the diagnosis to BNSF and requested time off.

14. BNSF asked Neylon when he had first suffered the tendinitis, and Neylon speculated that it may have been back in June of 2015, when he climbed onto the train and felt a pop in his left ankle.

15. BNSF then noticed Neylon to an internal hearing for supposedly violating its workplace rule requiring employees to immediately report all injuries.[1]

16. BNSF does not define (much less train its employees on) what constitutes a reportable injury.

### BNSF'S RETALIATORY MOTIVE

17. Railroads' motive to discourage workers from reporting injuries includes that it is exempt from Workers' Compensation, which means it is liable to employees whose injuries are caused by its negligence, and the agency responsible for enforcing railroad safety laws—the Federal Railroad Administration ("FRA")—uses the number of reported injuries to determine

---

[1] Pursuant to his union's collective bargaining agreement with BNSF, Neylon could not be disciplined unless BNSF charged him with a workplace rule violation and held an investigatory hearing (an internal process whereby the company appoints a hearing officer to take testimony from the employees involved in the alleged workplace rule violation). The hearings are not a neutral forum where an employee's responsibility for a safety violation is fairly and independently determined; rather, they are a perfunctory means to assign blame to employees regardless of their actual responsibility for safety violations. For example, hearing officers, who act as both prosecutor and judge, are members of management who are appointed by the company; hearing officers have no legal training; charged employees do not have legal counsel present; the rules of evidence do not apply and employees are frequently found responsible based entirely on hearsay; the company can compel witnesses to appear but employees cannot; the company conducts an investigation prior to the hearing but does not provide any discovery – not to mention exculpatory evidence – to the charged employee; and the hearings typically take less than one day. Indeed, it is well known that hearings almost always are decided in favor of the railroad.

where it should send its inspectors. See, e.g., Barati v. Metro-N. R.R. Commuter R.R. Co., 939 F. Supp. 2d 143, 148 (D. Conn. 2013) (quoting the testimony of the former head of the FRA's Office of Safety).

18. BNSF also ensures that supervisors have a personal motive to discourage their subordinates from reporting workplace injuries by maintaining an incentive compensation plan whereby it ranks its managers based, in part, on the number of FRA-reportable injuries employees report (with fewer injury reports translating to bigger bonuses).

19. BNSF maintains such a ranking system plan despite Congress having expressed concern as early as 2008 "that some railroad supervisors [have] intimidated employees from reporting injuries to the FRA, in part, because their compensation depended on low numbers of FRA reportable injuries within their supervisory area." Araujo v. New Jersey Transit Rail Operations, Inc., 708 F.3d 152, 161 n. 7 (3d Cir. 2013) (citing Hearings).

## BNSF'S RETALIATION WAS PURSUANT TO ITS COMPANYWIDE PRACTICES AND POLICIES

20. The workplace rule BNSF alleges Neylon violated applies companywide.

21. It is a common and companywide practice at BNSF to use these and its other rules, some of which are vague and essentially incorporate not being injured as an element of the rules themselves, to justify retaliation against employees who report injuries. See, e.g., Occupational Safety & Health Admin., Accord Regarding BNSF Policies (Jan. 11, 2013), available at http://www.whistleblowers.gov/acts/bnsf_accord.html.

22. Despite these and other numerous FRSA violations, BNSF has disciplined only a single supervisor for retaliating against employees for engaging in FRSA-protected activity.

4

## CAUSES OF ACTION

### VIOLATIONS OF 49 U.S.C. §§ 20109(a)(4)

23.     The FRSA prohibits railroad carriers from demoting, suspending, reprimanding, or in any other way discriminating against an employee for engaging in protected activity. Protected activity includes "notify[ing], or attempt[ing] to notify, the railroad carrier . . . of a work-related personal injury . . . ." 49 U.S.C. § 20109(a)(4).

24.     Neylon engaged in protected activity by reporting his left-ankle injury to BNSF.

25.     BNSF knew Neylon had engaged in protected activity when it terminated him.

26.     BNSF took an adverse action against Neylon when it terminated him.

27.     Neylon's protected activity was a contributing factor in BNSF's decision to take adverse actions against him. In fact, the adverse action against Neylon resulted directly from his protected activity.

### VIOLATIONS OF 49 U.S.C. §§ 20109(c)(2)

28.     The FRSA prohibits railroad carriers from "threaten[ing] discipline to[ ] an employee for . . . following orders or a treatment plan of a treating physician . . . ." 49 U.S.C. § 20109(c)(2).

29.     Neylon engaged in protected activity by telling BNSF that his physician had ordered him to take time off for his ankle.

30.     BNSF knew Neylon had engaged in protected activity when it terminated him

31.     BNSF took an adverse action against Neylon when it terminated him.

32.     Neylon's protected activity was a contributing factor in BNSF's decision to take an adverse action against him. In fact, the adverse action against Neylon resulted directly from his protected activity.

## **REQUEST FOR RELIEF**

33. Neylon requests that the Court find BNSF acted in direct violation of the FRSA.

34. Neylon further requests that the Court order BNSF to:

- reinstate him;

- clear and/or expunge any record of misconduct by him regarding the incident described herein;

- pay to him an award for compensatory damages arising from loss of income and benefits in an amount to be determined by the trier of fact;

- pay to him an award for garden-variety emotional distress in an amount in excess of $75,000.00;

- pay to him an award for costs (including litigation and expert costs), disbursements, and attorneys' fees; and

- pay to him an award for $250,000 for punitive damages.

35. Neylon further requests that the Court order judgment against BNSF for all other relief available under the FRSA and such other relief as the Court deems just and equitable.

DATED:  June 30, 2017                    Respectfully submitted,

MACLEAN LAW FIRM, P.C.


/s/ Scotty MacLean
**Scotty MacLean**
State Bar No. 00787942

4916 Camp Bowie Blvd.
Ft. Worth, TX 76107
817-529-1000 (Telephone)
817-698-9401 (Facsimile)
smaclean@macleanfirm.com

6

**NICHOLS KASTER, PLLP**

Matthew H. Morgan (MN # 304657)*
Nicholas D. Thompson (MN # 389609)*
4600 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Telephone: (612) 256-3200
Facsimile: (612)338-4878
morgan@nka.com
nthompson@nka.com

*Pro Hac Vice* applications forthcoming

7